UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SEAN BOGLE,

v.

CASE NO. 8:25-cv-02957-SDM-SPF

CITY OF PALMETTO, et al,

______________________________________/

**ORDER**

Alleging excessive force and denial of medical care, Sean Bogle, as administrator of the estate of Breonte Davis, sues under 42 U.S.C. § 1983 the City of Palmetto; Palmetto police officers Martin Illames, Matthew Wilson, Miguel Rodriguez, Vincent Diorio, and Ryan LaRowe; the City of Bradenton; Bradenton police officer Julian Jackson; Manatee County; and Manatee County emergency medical technicians (EMTs) Sam Albon and Jennifer Alexander. The defendants move (Docs. 8, 24, 30–33, 35–37) to dismiss and, alternatively, for summary judgment. In support, the defendants submit (Doc. 25) body-camera and dash-camera video and Davis's autopsy and toxicology reports. The plaintiff responds (Docs. 40–45) in opposition.

Because the video and the reports evidence essential facts, an order (Doc. 46) converts the motions to motions for summary judgment, and an order (Doc. 54) grants the plaintiff's motion (Doc. 48) for an extension of time to

respond to the motions for summary judgment. The plaintiff responds (Doc. 55), and the defendants reply (Docs. 56 and 57).

## BACKGROUND

### The Arrest

Around 2:20 a.m. on November 1, 2023, a cashier at a Circle K convenience store called the Palmetto Police Department to report a man "acting erratically and disruptive towards staff and other customers."[1] (Doc. 1 ¶ 32; Doc. 25-6 at 00:39–00:41) Soon thereafter, Officers Cottom, Illames, Wilson, and Jackson arrived and observed Davis — a thirty-six-year-old black male, five-feet-ten and 263 pounds — "running out" the store. (Doc. 1 ¶¶ 1, 33; Doc. 25-10 at 5) Davis climbed onto the hood of a parked police cruiser occupied by Officer Cottom and repeatedly rolled from one side of the hood to the other while squealing incoherently and emitting high-pitched noises. (Doc. 1 ¶ 36; Doc. 25-1 at 00:20–00:44)

Officer Cottom exited the cruiser; said, "What you doing, man? Get off our car;" and told Davis five times to "calm down." (Doc. 25-2 at 00:31–00:41) Davis slid off the hood onto the road and, still squealing and emitting noises, attempted to run past Officer Cottom, who grabbed Davis by the arm

---

[1] In successive interviews with Officer Rodriguez and contemporaneous with Davis's arrest, (1) a Circle K customer said that Davis was "hollering . . . screaming . . . panicking . . . and knocking stuff down"; (2) a cashier said that Davis "fell off [a] bike, threw the bike [aside] . . . came in . . . started screaming . . . shaking the counters . . . pushing my co-worker . . . and . . . ran [outside]"; (3) another employee said "that man touched me" and "he high right now." (Doc. 25-6 at 00:21–02:35)

and said, "Stop. Stop, man. Stop. Take it easy." (Doc. 25-2 at 00:41–00:47) Davis broke free and again attempted to flee, but Officer Jackson, standing nearby, tackled Davis to the ground. (Doc. 25-2 at 00:47–00:50)

Officer Jackson, soon joined by Officer Cottom, began restraining Davis, who was lying face-down on the road, struggling to escape, and continuing to squeal and emit noises. After about thirty seconds, the officers handcuffed one of Davis's wrists. (Doc. 25-2 at 00:50–01:20)

About ten seconds later, Officer Cottom said, "Stop," and deployed a five-second TASER burst, during which he said, "Hands behind your back, now." (Doc. 25-2 at 01:20–01:35) About seventeen seconds later, while Davis continued to struggle, Officer Cottom deployed a second five-second TASER burst, during which he said, "Stop pulling away. You're gonna get it again." (Doc. 25-2 at 01:35–01:57)

About five seconds after the second burst ended, while still struggling and amid continued squealing noises, Davis said, "I can't breathe" three times in quick succession. (Doc. 25-2 at 01:57–02:07) Davis continued struggling, squealing, and emitting noises until the two officers — now joined by Officers Illames, Wilson, and Rodriguez — handcuffed Davis's other wrist about thirty seconds later, at 2:23 a.m. (Doc. 1 ¶ 48; Doc. 25-2 at 02:07–02:37)

With Davis handcuffed, lying on the road, and still struggling, squealing, and emitting noises, the officers removed the TASER probes, searched

Davis's pockets,[2] and repeatedly rolled Davis onto his side, telling him at various points to "relax," to "breathe," to "stop kicking," and to "lay on your side," and asking him "what's your name" and "what did you take."[3] (Doc. 25-2 at 02:37–03:24; Doc. 25-7 at 02:06–05:07)

**EMT Response**

At 2:26 a.m., about three minutes after the officers handcuffed Davis, the EMTs arrived. (Doc. 25-6 at 05:22) They immediately approached Davis, who was still lying on the road, observed him, and donned gloves as the officers stabilized Davis on his side. (Doc. 25-6 at 05:22–06:15) Standing over Davis — who had been rolled onto his back and was still moving, squealing, and emitting noises — EMT Albon, accompanied by EMT Alexander, asked, "hey, what's going on? Can you talk to me? I'm the paramedic that's gonna help you. What did you take tonight?" (Doc. 25-6 at 06:21–07:07) Davis did

---

[2] An officer searching Davis's pockets stated, "I hear glass." (Doc. 25-6 at 04:02) An officer then shook the pocket area of Davis's shorts, and the sound of clinking glass could be heard. (Doc. 25-6 at 04:06–04:08) When one officer asked, "you want me to check his pockets," another responded, "There's something. I don't know if it's a needle or if it's a crackpipe." (Doc. 25-6 at 04:20–04:29)

[3] When the officers finished handcuffing Davis, he was lying face-down. (Doc. 25-7 at 02:06) About eight seconds later, one officer instructed another to "put [Davis] on his side." (Doc. 25-7 at 02:14) Over the following ten seconds, an officer slowly rolled Davis onto his side. (Doc. 25-7 at 02:14–02:25) Davis rolled back onto his abdomen within about five seconds, and an officer again ordered another to place Davis on his side. (Doc. 25-7 at 02:25–02:33) The officer complied, but Davis immediately rolled back onto his abdomen. (Doc. 25-7 at 02:33–02:37) About a minute later, an officer rolled Davis onto his side again. (Doc. 25-7 at 02:37–03:29) Thereafter, Davis remained primarily on his side until the EMTs arrived, though he continued to struggle and intermittently rolled back onto his abdomen. (Doc. 25-7 at 03:29–05:07)

not answer but continued to emit noises as the EMTs walked to the ambulance to retrieve a stretcher. (Doc. 25-6 at 07:07–09:12)

Upon the EMTs' return about two minutes later, Davis was emitting noises but fell silent one minute after the EMTs began preparing the stretcher. (Doc. 25-6 at 07:07–10:15) Almost simultaneously with Davis's falling silent, EMT Alexander bent over him and said, "Listen to me. Stop fucking flopping around so I can get your vitals, ok?" (Doc. 25-6 at 10:14–10:22)

About two minutes after Davis fell silent and after reading his vitals with an EKG, EMT Alexander instructed EMT Albon to check Davis's pulse. (Doc. 25-1 at 10:39–12:43) After checking for about five seconds and finding no pulse, the officers rolled Davis—who by this time was again lying face-down — onto his back. (Doc. 25-1 at 12:43–12:54)

For about the next minute, the officers performed chest compressions. (Doc. 25-1 at 13:00–14:11) EMT Albon ordered the officers to stop compressions and roll Davis onto his abdomen to remove the handcuffs. The officers complied, and the EMTs attached an EKG and rolled Davis onto his back to resume compressions. (Doc. 25-1 at 14:11–14:46) The officers continued compressions until the EMTs attached a LUCAS device to Davis. (Doc. 25-1 at 14:46–15:43) With the compression device running, the officers lifted Davis by his arms and legs and placed him on the stretcher. (Doc. 25-1 at 15:43–16:23) The EMTs and officers transported the stretcher bearing Davis into the ambulance. (Doc. 25-3 at 13:15–15:46)

## Hospitalization, Death, and Autopsy

On February 9, 2024, after a November 3, 2023 autopsy examination, District Twelve Chief Medical Examiner Russell S. Vega, M.D. issued a "Summary and Opinion":

> At autopsy, the only injuries identified were minor cutaneous abrasions, contusions, and lacerations; very superficial punctures consistent with (probably incomplete) ECD barb penetration; and two pairs of small, very superficial skin blisters consistent with ECD applications in drive-stun mode. The heart was remarkable for moderate coronary artery disease, with maximal blockage of 60% in the left anterior descending artery. The heart was minimally enlarged. Subtle evolving myocardial infarct was present, consistent with the clinical findings. This appears likely due to the underlying intoxication and subsequent cardiac arrest (see below) superimposed on an only moderately compromised artery. . . .
>
> Toxicologic analysis of blood obtained upon hospital admission revealed the presence of methamphetamine at a level of .62 mg/L, along with the presence of N,N-Dimethylpentylone, a synthetic stimulant. Insufficient admission blood specimen remained to quantify the N,N-Dimethylpentylone, however analysis of blood sampled at autopsy found N,N Dimethylpentylone at a level of 360 ng/mL and Pentylone, its primary metabolite, at a level of 66 ng/mL. This suggests that the level of N,N-Dimethylpentylone in his hospital admission blood would have been significantly higher than 360 ng/mL.
>
> The myocardial infarction identified clinically and at autopsy likely occurred as a result of the cardiac arrest rather than vice-versa; however, the occurrence of the infarction prior to his encounter with police cannot be excluded. The erratic and highly energetic behavior exhibited by the decedent prior to his cardiac arrest (some might describe this as a state of excited delirium) is consistent with intoxication by various stimulants, and is best explained by the presence of both the methamphetamine and the N,N-Dimethylpentylone found in his blood. The relatively consistent nature of the decedent's behavior prior to, throughout, and after his subdual suggests that the subdual had little physiological effect on the decedent. In addition, the period of time after subdual, when it is likely that the decedent was *not* in a position causing respiratory or cardiovascular compromise,

> speaks against subdual playing a causal role in his subsequent cardiac arrest. Finally, the presence of these stimulant drugs in his system put the decedent at high risk of sudden cardiac arrest, especially in the setting of an acute behavioral crisis such as he was experiencing with a baseline of mild heart disease.
>
> Accordingly, it is my opinion, based on all of the available information, including review of EMS records, MMH hospital records, law enforcement reports, and review of law enforcement body-cam videos, that the cause of death is Multiple Organ Failure following Resuscitation from Cardiac Arrest due to Spontaneous Ventricular Arrhythmia (Sudden PEA Cardiac Arrest) due to Acute Intoxication with Methamphetamine and N,N-Dimethylpentylone. While his underlying heart disease was relatively mild, it likely potentiated the effect of drugs in causing the cardiac arrest; accordingly, Arteriosclerotic and Hypertensive Heart disease are in my opinion contributory in causing the death. The manner of death is accident.

(Doc. 25-10 at 2–3)

**Claims for Relief**

Arising from what he characterizes as "the tragic and senseless tasing death of . . . an unarmed Black man, who in the midst of a health-related crisis, was treated as a violent criminal and denied medical attention," the plaintiff alleges (1) excessive force as to the Palmetto and Bradenton police officers; (2) denial of medical care as to all defendants; (3) supervisory liability as to Sergeants Diorio and LaRowe for the excessive force and denial of medical care; and (4) municipal liability as to the Cities of Palmetto and Bradenton and Manatee County for the excessive force and denial of medical care.

**DISCUSSION**

"Qualified immunity offers complete protection for individual public officials performing discretionary functions insofar as their conduct does not

violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Loftus v. Clark–Moore*, 690 F.3d 1200, 1204 (11th Cir. 2012) (quoting *Sherrod v. Johnson*, 667 F.3d 1359, 1363 (11th Cir. 2012). To receive qualified immunity, an official must first establish that he was acting within his discretionary authority. *Leslie v. Hancock Cnty. Bd. Of Educ.*, 720 F.3d 1338, 1345 (11th Cir. 2013). Once the official proves that he was acting within the scope of his discretionary authority, "the burden shifts to the plaintiffs to show that qualified immunity is inappropriate." *Terrell v. Smith*, 668 F.3d 1244, 1250 (11th Cir. 2012). The plaintiff must show that the defendant "violated a constitutional right" and that the right was "clearly established." *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019).

A plaintiff can demonstrate that the right was clearly established through materially similar case law; a "broader, clearly established principle that should control the novel facts of the situation;" or by showing that the conduct obviously violates the constitution that "prior case law is unnecessary." *Loftus*, 690 F.3d at 1204–05.

Neither the plaintiff nor the defendants dispute that the Palmetto officers acted within the scope of their discretionary authority when they detained Davis, who has the burden to establish that the police officers "violated a constitutional right" and that the violation was "clearly established" at the time of the misconduct. *Terrell*, 668 F.3d at 1250.

## Excessive Force

The standard for whether excessive force was used is whether the "officer's conduct was objectively reasonable in light of the facts confronting the officer." *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002). Several factors determine the necessity of the use of force, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989); *see Teel v. Lozada*, 99 F.4th 1273, 1283 (11th Cir. 2024) ("the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.").

Here, the plaintiff argues that the totality of the circumstances demonstrates that the officers used excessive force against Davis. (Doc. 55 at 8) However, no law clearly establishes that the deployment of a TASER twice to place handcuffs on a resisting subject is unconstitutional. The use of a TASER twice to subdue a resisting subject neither obviously violates the constitution nor presents a novel set of facts. *Loftus*, 690 F.3d at 1204–05. Instead, the plaintiff cites the following nine cases as materially similar and establishes that the officers had notice that their conduct violated Davis's constitutional rights. None is materially similar; each is easily distinguished.

The plaintiff cites (1) *Sebastian v. Ortiz*, 918 F.3d 1301, 1311 (11th Cir. 2019); (2) *Hadley v. Gutierrez*, 526 F.3d 1324 (11th Cir. 2008); (3) *Scott v. Battle*,

688 F. App'x 674 (11th Cir. 2017); (4) *Wate v. Kubler*, 839 F.3d 1012, 1020 (11th Cir. 2016); (5) *Oliver v. Fiorino*, 586 F.3d 898 (11th Cir. 2009); (6) *Helm v. Rainbow City, Alabama*, 989 F.3d 1265 (11th Cir. 2021); (7) *Emily Sizemore, v. City of Montgomery, Alabama, et al.*, No. 2:23CVL98-MHT, 2026 WL 856769 (M.D. Ala. Mar. 27, 2026); (8) *Saunders v. Duke*, 766 F.3d 1262, 1265 (11th Cir. 2014); and (9) *Smith v. Mattox*, 127 F.3d 1416 (11th Cir. 1997)).

In *Ortiz*, an officer "became enraged" after denial of permission to search the interior of a vehicle after a traffic violation. 918 F.3d at 1305. The officer opened the vehicle's door and placed the driver in metal handcuffs, which stopped circulation in the driver's hand. 918 F.3d at 1305. Despite the driver informing the officers that the driver was beginning to lose feeling in his hands, the driver remained in handcuffs for five hours, which resulted in the handcuffs damaging the nerves in the driver's hands and wrists. 918 F.3d at 1305.

In *Gutierrez*, an officer—for "no apparent reason other than malice."—punched a criminal suspect who was handcuffed and not struggling or resisting. 526 F.3d at 1334.

In *Battle*, the five-foot-four and 110-pound suspect was handcuffed, but a six-foot-one and 250-pound officer lifted the suspect and slammed her on the pavement. 688 F. App'x at 675–76. As a result, the suspect fractured her tibial plateau, was wheelchair-bound for five days, received leg surgery, and used crutches for the following six months. 688 F. App'x at 676.

In *Kubler*, the officer deployed five TASER shots within two minutes. 839 F.3d at 1017. The medical examiner identified the cause of death as asphyxia with contributory conditions of blunt trauma and restraint. 839 F.3d at 1017. The arrestee's injuries included scattered abrasions, contusions, and lacerations, subgaleal hemorrhage, and cerebral edema. 839 F.3d at 1017.

In *Oliver*, the officer, without warning, tased the compliant subject. 586 F.3d at 902. The officer tased a second time while the subject was lying still on the ground. 586 F.3d at 903. The officer deployed six more TASER shots—for a total of eight. 586 F.3d at 903. Throughout this interaction, no officer tried to arrest or handcuff the subject. 586 F.3d at 903. After eight TASER shots, the subject was foaming at the mouth and was later pronounced dead. 586 F.3d at 903. The medical examiner concluded that the subject died because of the eight TASER shots. 586 F.3d at 903.

In *Helm*, several officers were informed that a minor was having a seizure. 989 F.3d at 1269. The officers conceded that at no point throughout the minor's seizure did the minor pose a threat to the officers. 989 F.3d at 1270. Four or five officers restrained the minor during the seizure. 989 F.3d at 1270. Despite this, one officer, claiming not to have known of the minor's condition, tased the minor in the chest using the "drive stun mode." 989 F.3d at 1270.

In *Sizemore*, an officer deployed a second TASER shot sixteen seconds after the initial taser shot. 2026 WL 856769 *2. During those sixteen seconds, the subject attempted to comply with the officer's orders to get out of the

vehicle but "it was difficult because her left arm was being controlled by the officer, she had just been tased, and she was also overweight at the time." 2026 WL 856769 *2.

In *Saunders*, the arrestee, during the arrest, was holding his face above the hot pavement to keep himself from burning. 766 F.3d at 1265. Although the arrestee was not resisting or attempting to flee, but merely lifting his head above the pavement, one of the officers slammed the arrestee's face onto the pavement with extreme force, which caused blood to pour from the arrestee's mouth and face. 766 F.3d at 1265. The arrestee suffered injury to his teeth, jaw, and left eardrum. 766 F.3d at 1265–66.

In *Mattox*, an officer placed his knee on the arrestee's lower back in an effort to handcuff him. 127 F.3d at 1418. While pulling the arrestee's arm behind his back to fasten the handcuffs, the officer broke the arrestee's arm. 127 F.3d at 1418. The parties disputed whether the arrestee was resisting arrest and reaching for the officer's gun. 127 F.3d at 1418.

Neither the precedent on which the plaintiff relies nor any other precedent clearly establishes that two deployments of a TASER under the circumstances presented in this case is unconstitutional. The cases on which the plaintiff relies differ materially from the present case in the number of TASER deployments, the degree of the arrestee's compliance with law enforcement, or the causal relation between the officers' use of force and the arrestee's sustained injuries. Despite the plaintiff's assertion that the officers refused to

have a conversation with Davis, the video evidence establishes that Officer Cottom exited the cruiser and said to Davis "What you doing, man? Get off our car" and told Davis five times to "calm down." (Doc. 25-2 at 00:31–00:41)

Unlike *Ortiz*, *Battle*, *Kubler*, *Oliver*, *Saunders*, and *Mattox*, the alleged “excessive force” used by the police officers neither caused nor contributed to the injury that Davis sustained. (Doc. 25-10 at 2–3) The medical examiner concluded that the subdual played no “causal role in his [Davis] subsequent cardiac arrest.” (Doc. 25-10 at 2–3). Unlike *Gutierrez*, *Helm*, and *Sizemore*, the officers in this case were actively attempting to place handcuffs on the resisting Davis. (Doc. 25-2 at 01:20–01:35)

For these reasons, the totality of the circumstances demonstrates that none of the police officers used excessive force in restraining Davis, in attempting to handcuff a defiant Davis, nor in tasing Davis. Thus, Davis’ excessive force claim fails.

**Denial of Medical Care**

To prevail on a denial-of-medical-care claim, a plaintiff must establish the “existence of an objectively serious medical need” and that the “officers were deliberately indifferent to his serious medical need.” *Valderrama v. Rousseau*, 780 F.3d 1108, 1116 (11th Cir. 2015). For the second inquiry, the plaintiff must establish that “(1) the officer was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, (2) the officer actually drew that inference, (3) the officer disregarded the risk of serious

harm, and (4) the officer's conduct amounted to more than gross negligence." *Valderrama*, 780 F.3d at 1116.

Here, the video footage establishes that none of the officers disregarded the risk Davis faced. About three minutes after the officers handcuffed Davis, the EMTs arrived. (Doc. 25-6 at 05:22) The officers called and received a "priority response" from EMS, which immediately approached Davis, who was still lying on the road, observed him, and donned gloves as the officers stabilized Davis on his side. (Doc. 25-6 at 05:22–06:15)

For these reasons, the officers violated no clearly established or any other law and are entitled to qualified immunity.

**Supervisory Liability Claim Against Sergeants Diorio and LaRowe**

The supervisory liability claim fails because of the absence of an underlying constitutional violation. *See Stalley v. Cumbie*, 124 F.4th 1273, 1288 (11th Cir. 2024) ("Plaintiffs cannot maintain a supervisory liability claim tied to an alleged underlying constitutional violation if it is determined that no such violation occurred."). Also, "if a subordinate is entitled to qualified immunity for his conduct, his supervisor is also entitled to qualified immunity for that same conduct." *Stalley*, 124 F.4th at 1288.

**Municipal Liability**

The plaintiff fails to articulate a specific policy or custom of any of the defendant counties or cities that caused the alleged constitutional violations. The plaintiff presented no evidence of any other instances of constitutional

violation by Manatee County or Bradenton or Palmetto that suggest a need for further training. A plaintiff may not succeed on a municipal liability claim if unable to "point to any other incidents involving similar facts." *Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005) (citing *Gold v. City of Miami*, 151 F.3d 1346, 1351 (11th Cir. 1998))."

In all events, municipal liability is not a freestanding claim but a means to attribute to a municipality a constitutional violation committed by a municipal actor. Because Counts I through III state no underlying constitutional violation, Count IV necessarily fails. *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).

## CONCLUSION

For these reasons and for the other meritorious reasons stated in the nine motions (Docs. 8, 24, 30, 31, 32, 33, 35, 36, and 37) to dismiss, the motions, construed as motions for summary judgment, are **GRANTED**. The Clerk is directed to enter judgment in favor of the defendants and against the plaintiff on all claims. The clerk must close the case.

ORDERED in Tampa, Florida, on September 21, 2026.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE